### BARRETT v. BROAD RIVER POWER COMPANY

#### (143 S. E., 650)

1. ACTION—STATUTE AUTHORIZING PLAINTIFF TO UNITE IN SAME COMPLAINT CAUSES OF ACTION GROWING OUT OF SAME TRANSACTION MAY BE INVOKED BY DEFENDANT TO COMPEL JOINDER IN PROPER CASE (CODE CIV. PROC. 1922, § 430).—Though Code Civ. Proc. 1922, § 430, providing that plaintiff may unite in same complaint several causes of action, legal or equitable, or both, if they arise out of same transaction, or transactions connected with same subject may have been enacted mainly for plaintiff's benefit, it may, in proper instance, be invoked for protection of defendants, and Court may require plaintiff to try all such cases together, if he refuses to unite.

2. APPEAL AND ERROR—TRIAL COURT'S GRANTING OR REFUSAL OF MOTION TO CONSOLIDATE WILL BE DISTURBED, IF IT DEPRIVES PARTY OF SUBSTANTIAL RIGHT; "ABUSE OF DISCRETION."—Ordinarily, the granting ,or refusing of motions to consolidate actions for trial must be left to the wise discretion of the trial Judge, but his exercise thereof will be disturbed, if it deprives a party of a substantial right which he can show he is entitled to under the law; "abuse of discretion" as used in this connection merely meaning that trial Court committed an error of law in the circumstances.

3. ACTION—WHERE ACTIONS MAY BE PROPERLY CONSOLIDATED WITHOUT INJURY TO PARTIES, IT SHOULD BE DONE (CODE CIV. PROC. 1922, § 430).—Where actions may. be properly consolidated without in-

jury to any of the parties that course should be taken to prevent
a multiplicity of suits, to save costs to parties, to conserve time
of Court, to clear congested dockets, and to help taxpayers who
bear expenses of maintaining Courts, and defendant when brought
into Court in separate actions on numerous complaints which
could be joined in one suit under Code Civ. Proc. 1922, § 430, has
a substantial right to request Court to force his adversary to try
all cases together.

4. ACTION—ELECTRIC COMPANY'S MOTION TO CONSOLIDATE ACTIONS
AGAINST IT FOR DISCONTINUING AND REFUSING TO RESTORE ELECTRIC
SERVICE HELD IMPROPERLY DENIED (CODE CIV. PROC. 1922, § 430).
—Defendant electric company's motion to consolidate plaintiff's
four separate actions against it for discontinuing electric service,
and for such discontinuance and failure to restore service on de-
mand, *held* improperly denied, under Code Civ. Proc. 1922, § 430.

5. ELECTRICITY—ELECTRIC COMPANY HAD RIGHT TO DISCONTINUE SERV-
ICE FOR NONPAYMENT OF RECENT AND JUST BILLS THEREFOR.—
Electric company had a right to discontinue its service to customer
on his nonpayment of recent and just bills for the service fur-
nished him, and also the right to refuse a further supply of
electricity until those bills were paid.

6. ELECTRICITY—CONTRACT REQUIRING CUSTOMER TO DEPOSIT COST OF
EXTENDING LINE AND ELECTRIC SERVICE CONTRACT HELD SEPA-
RATE, AS RESPECTS CUSTOMER'S RIGHT TO SET OFF REFUND DUE
UNDER FORMER AGAINST ELECTRIC SERVICE BILL.—Written "con-
struction contract" providing for extension of electric line to
plaintiff's premises and requiring plaintiff to deposit with electric
company the entire cost thereof, to be refunded in accordance
with terms and conditions filed with State Railroad Commission,
and "service contract" providing for furnishing electric service
to such premises, *held* separate and distinct agreements, as re-
spects plaintiff's right to set off amount of refund due him under
construction contract against amount due to company for electric
service.

7. ELECTRICITY—BONA FIDE DISPUTE AS TO REFUND DUE CUSTOMER
UNDER CONSTRUCTION CONTRACT HELD NOT TO AUTHORIZE CUS-
TOMER'S REFUSAL TO PAY FOR ELECTRICITY UNTIL DISPUTE SETTLED.
—Dispute between customer and electric company as to amount
due customer under refund provisions of construction contract
requiring customer to deposit cost of extending line to his prem-
ises, even if *bona fide, held* not to authorize customer to refuse to
pay electric service bills, respecting which there was no dispute,
until such dispute was settled, and on his refusal to pay such
service bill company was justified in discontinuing service and

refusing to restore it until bill was paid, regardless of amount of refund due under construction contract.

Before HENRY, J., Richland, March, 1926. Reversed and remanded with directions.

Action by S. J. Barrett against the Broad River Power Company. Judgment for plaintiff, and defendant appeals.

Contracts and rules directed to be reported are as follows:

CONSTRUCTION CONTRACT

*Application for Electric Service Line Extension*

*On Addition*

Class of Service Electric Lights—110 Volts

The undersigned, hereinafter called the applicant, hereby makes application to the Columbia Railway, Gas & Electric Company, hereinafter called the company, for the furnishing, construction, and placing in operation of an electric service line extension, including the cost of service connections, individual transformers, or increased transformer capacity, extension of primary and secondary mains from the nearest suitable electric service line of the company located at Columbia, S. C., R. F. D. No. 1, on Old Winnsboro road, one-half block north of Clarendon Street, lot of Lizzie T. Barrett owned by S. J. Barrett and occupied by S. J. Barrett as residence.

The applicant agrees to deposit with the company the sum of sixty-six and 08/100 dollars ($66.08), which is the estimated cost of all labor, material, and other items of expense required for the construction of the above-specified electric service line extension, and expressly understands and agrees that all rights and title to said electric service line extension shall at all times be and remain in the company.

Upon full payment of the above deposit to the company by the applicant, and the acceptance of his application by the company, the company shall proceed to furnish, construct, and place in operation the said electric service line

extension, subject, however, to delay due to shortage of material or labor, strikes, or any other causes beyond the company's control.

Refund shall be made to applicant in accordance with general terms and conditions as filed by the company with the Railroad Commission of South Carolina.

Extension to be made in accordance with R. C. S. C. No. 1, Rule No. 15.

'S. J. BARRETT, Applicant.

Estimated cost of extension $66.08, received by C. M. Tew, Jr., Assistant Cashier.

Refund to be in accordance with Rule No. 15, J. M. Costello, Auditor.

Accepted: Columbia Railway, Gas & Electric Company, by F. K. Woodring, General Manager.

Rule 15 of the Railroad Commission and other rules of the commission introduced in evidence are as follows:

### 15. EXTENSION IN MUNICIPALITIES

Upon request to the company to supply its service in any city or town in which the company operates for either light or power or both at a location where it is necessary for the company to make main or distributing line extensions involving a total expenditure of an amount greater than the estimated revenue for a twelve months' period to be paid by the prospective consumer, the prospective consumer shall deposit with the company in advance an amount of money equal to the total estimated expenditure necessary for the main or distributing line extension.

When such a deposit is made with the company by the prospective consumer, the company will give the consumer credit each six months, in an amount of 25 per cent. of the consumer's bills for service furnished, until the sum of all credits is equal to the original deposit made to the company, plus 6 per cent. interest per annum.

Should additional business be secured on the main and distributing lines built under such deposit, an additional credit will be made of 25 per cent. of the additional business served from the main or distributing line extension.    Settlement to be made to the depositor semi-annually, January 1st and July 1st.

The aggregate of all credits shall in no case exceed the amount of the original deposit and interest charges.   Should the original consumer making the deposit cease to use the company's services in the premises to which the main or distributing line extension is made, the credits will be made to the original depositor as set forth in the foregoing, in proportion to the use of the company's service by succeeding occupants of the premises, and any additional business served on the main or distributing line extension in the percentum above stipulated.   Any balance of said deposit or interest charges not so repaid within five (5) years shall be retained by the company.

Nothing herein contained shall in any manner be construed as conferring upon the depositor any title or right of equity in said extension of main or distributing lines.

### 5. ACCESS TO CONSUMER'S PREMISES

The company's authorized agents, or employees, shall have access, at all reasonable times, to its property, and to all of the electrical wiring and equipment owned by the consumer, or any one else, and installed on the consumer's premises.

### 8. CAUSE OF DISCONTINUANCE OF SERVICE

The company reserves the right to discontinue service and disconnect its lines and remove its property for any of the following reasons:    (1)  For repairs; (2) for want of supply; (3) for nonpayment of bills when due; (4) for fraudulent representation in relation to consumption of electricity; (5) for violation of any of the conditions of this contract; (6) for the reason that the consumer's service is detrimental to service in general, or in his immediate locality; (7) if it

conflicts with orders, ordinances, or laws of the State of South Carolina, or any political subdivision thereof.

In case service is discontinued on account of reasons 3, 4 or 5, noted above, service will only be reconnected upon payment of all money due the company, payment of a deposit, and payment of an additional amount sufficient to cover the cost of disconnecting and reconnecting service.

In the event of the consumer's plant being shut down on account of strike, fire, or lockout, thus making a complete cessation of operations unavoidable, the minimum charge or guaranty will be waived during such period, provided, however, that the term of this contract shall be extended for a corresponding period.

In case the company through any act of negligence of the consumer is prevented from supplying electricity through the entire term of this contract, there shall then become due and payable to the company, in lieu of the returns from such supply during the unexpired term of the contract, as liquidated damages and not as penalty, a further sum equal to the monthly minimum charge hereunder multiplied by the number of months remaining in the unexpired portion of said fixed term.

### 18. BILLS

The company will endeavor to deliver to the consumer, by mail or messenger, a monthly statement of the amount due the company under this contract. Failure to receive such statement from the company will not entitle the consumer to any delay in the settlement of each month's account beyond the date when the bill is due and payable. Unless otherwise specified, all bills will be payable at the office of the company between the hours of 8:30 a. m. and 5 p. m., within ten days of the date of bill.

### CONTRACT FOR ELECTRIC SERVICE

Name: Barrett, S. J.

### APPLICATION FOR ELECTRIC SERVICE

You are hereby requested to connect your mains with the equipment scheduled on the back hereof, installed on the premises at half block North Clarendon Street, City of Columbia, and furnish me with electric service for said equipment. In consideration of such connection being made I agree to take from the Columbia Railway, Gas & Electric Company all the electric service requested by me for the full term of this agreement and to pay for this service under rates as set forth in R. C. Schedule 8.

It is understood that the rates in said schedule and the service regulations are subject to changes ordered or approved by the state board having jurisdiction over public utilities.

The consumer agrees to pay the rates and observe the service regulations of the company in effect at the time service is rendered and filed with the state board having jurisdiction over public utilities.

The consumer agrees not to transfer this contract without the written consent of the company.

The term of this agreement shall extend from 1—23, 1925 (or as soon thereafter as the power company is able to deliver or the consumer to receive electric power), until terminated on a fixed date after 1—23, 1926, by either party giving to the other at least 30 days' written notice, specifying the date of termination.

In making this application, it is understood that it shall not be binding upon the company until accepted by it through its proper executive officers, and that it shall not be modified or affected by any promise, agreement, or representation by any agent or employee of the company made before or after signing unless incorporated in writing into this agreement before acceptance by the company.

Name: S. J. Barrett.

Address: Route No. 1.

*Messrs. Elliot & McLain,* for appellant, cite: *Test of whether more than one cause of action stated in complaint:* 1 C. J., 1056; Bliss on Code Pleading (3rd Ed.), Sec. 118; 1 C. J., 1058. *Discontinuance of service proper where there is admitted indebtedness to company at time of discontinuance:* 59 N. E., 327; 69 N. E., 258; 89 N. E., 319; 118 N. W., 1064; 19 L. R. A. (N. S.), 693. *Discontinuance justified where bona fide dispute as to correctness of bill rendered:* 81 S. C., 438; 106 S. C., 447. *Check is not payment unless accepted:* 101 S. C., 32.

*Messrs. E. J. Best* and *J. B. McLaughlin,* for respondent, cite: *Discontinuance of service unjustified where bona fide dispute as to amount due company by customer:* 81 S. C., 438; 106 S. C., 447. *Cases distinguished:* 69 N. E., 58. *For check to constitute tender or payment it must be accepted as such:* 101 S. C., 32.

June 7, 1928.

The opinion of the Court was delivered by Mr. Justice Blease.

Action, or, more properly, several actions on tort, growing out of the disconnection and discontinuance of the plaintiff's electric light service by the defendant. The trial was in the Court of Common Pleas for Richland County, before Hon. J. K. Henry, presiding Judge, and a jury. From a verdict and judgment for the plaintiff, for both actual and punitive damages, the defendant appealed to this Court.

The plaintiff instituted four separate suits against the defendant, in the same Court, and about the same time. Each charged torts, commencing on the same day, in practically the same manner, and concerning the same premises of the plaintiff. The gist of the several complaints (the numbers used being to designate the respective actions and not paragraphs in one action) was this:

"First: That 'the defendant and its agents negligently, carelessly, recklessly, willfully, maliciously, and unlawfully trespassed thereon and disconnected and discontinued the electric service of the plaintiff, the plaintiff having forbidden the said defendant and its agents to disconnect and discontinue his said electric service.'

"Second: 'The defendant and its agents after having been by the plaintiff first forbidden to do so entered on the premises of the plaintiff and willfully, maliciously, and unlawfully trespassed thereon and disconnected and discontinued the electric service of the plaintiff, the plaintiff having forbidden the said defendant and its agents to disconnect and discontinue his said electric service.'

"Third: That 'the defendant negligently, carelessly, recklessly, willfully, and unlawfully discontinued the electric service of the plaintiff. That the plaintiff has made demand upon the defendant and its agents to restore his electric service which was unlawfully discontinued as aforesaid, but the said defendant has negligently, recklessly, wantonly, and willfully refused to connect and restore the said electric service of the plaintiff as aforesaid.'

"Fourth: That 'the defendant and its agents negligently, unlawfully, recklessly, wantonly, and willfully entered the premises of the plaintiff and discontinued his electric service. That since the discontinuance of the said electric service of the plaintiff as aforesaid he has made repeated demands of the defendant and its agents to restore his said electric service, but the said defendant and its agents have negligently, wantonly, carelessly, recklessly, and willfully refused to restore the electric service of the plaintiff aforesaid.' "

The defendant filed answer in each of the four cases. It set up a general denial and—"alleged that the furnishing and discontinuance of plaintiff's electric service were in accord with the rules and regulations of the defendant and rules and regulations promulgated or approved by the Railroad Commission of South Carolina, and also in accordance with con-

tract between plaintiff and defendant, and further that defendant's entry upon plaintiff's premises was in pursuance of a right granted defendant in writing on January 19, 1925, and duly recorded in the Clerk's office for Richland County; and in each of, the cases the answer further set up that another action was pending between plaintiff and defendant upon the same cause of action."

The defendant moved, after notice, that all of the cases be consolidated and tried together, upon the ground that they all arose out of the same transaction and that defendant was entitled, in order to avoid a multiplicity of suits, to a trial of all the actions together. The motion for consolidation was granted as to three of the cases, Nos. 1, 2, and 3, but refused as to the fourth case. Such refusal forms the basis of one of the exceptions.

As to the consolidation of actions, Ruling Case Law says this:

"It is a common practice to consolidate actions pending in the same Court that might have been brought in one action, the purpose of the consolidation being to prevent a multiplicity of suits. Formerly it was considered that a Court of Chancery had no power to consolidate causes pending therein, but the rule at the present day is the same in equity as at law. Independent of statute the power of consolidation has been exercised with the greatest freedom, according to the will of the particular Judge before whom the actions consolidated have been pending, to subserve the interest of the parties and the public. * * * The consolidation of actions is not, in the absence of statute, a matter of right, but rests in the sound discretion of the Court, and its discretion will not be interfered with unless abused. The actions sought to be consolidated must be pending in the same Court, and generally between the same parties, though not always, and should relate to substantially the same question or transaction, involving substantially the same defense provided a

defense is intended. Consolidation of actions does not depend on the nature of the transaction to which both relate." 1 R. C. L., 359.

Speaking for this Court, Mr. Justice McIver said:

"It has long been settled, in this State at least, that a motion to consolidate is addressed to the discretion of the Court; not, of course, an arbitrary or a capricious discretion, but a legal discretion, to be exercised in view of all the surrounding facts and circumstances." *Pelzer Mfg. Co. v. Sun Fire Office,* 36 S. C., 213; 15 S. E., 562.

There is great similarity in all the complaints. Those in suits Nos. 1 and 2 are practically identical. Those in suits Nos. 3 and 4 are also almost identical. The distinguishing feature between actions Nos. 1 and 2, as compared with Nos. 3 and 4, is this: In the former the plaintiff sued for a discontinuance of his service, while in the latter he sued for both the discontinuance and the failure to restore the service on demand. It is clear that all the torts and damages alleged in all the complaints could have been set forth in one complaint. Section 430, Vol. 1, Code 1922, provides this:

"The plaintiff may unite, in the same complaint, several causes of action, whether they be such as have been heretofore denominated legal or equitable, or both, where they all arise out of:

"1. The same transaction, or transactions connected with the same subject."

When two causes of action pleaded are so allied in substance, time, and parties as to make them so akin, they may be tried together. *Cline v. Southern Ry.,* 110 S. C., 534; 96 S. E., 532. When they may be tried together, and there is no real good reason for separate trial, why should they not be tried together?

Although the provision quoted from the Code may have been enacted for the benefit, mainly of plaintiffs, it can, and should, be invoked, in a proper instance, for the protection of defendants. While a plaintiff has the right, in the first

instance, to elect if he will unite his several causes of action in one suit, the Court, as shown by the authorities before mentioned, may require him to try all of them together, if he refuses to unite.

It must be conceded, of course, that, ordinarily, the granting or refusal of motions to consolidate must be left to the wise discretion of the trial Judge. It has been indicated, however, in the matter of amendment of pleadings, where the Judge also has much discretion, *that his exercise thereof will be disturbed, if it deprives a party of a substantial right which he can show he is entitled to under the law.* Trumbo v. Finley, 18 S. C., 305.

We are sure that in many instances, in the years gone by, the rulings of presiding Judges, in matters wherein they are given the right to exercise their discretion, were not interfered with because of the old unfortunate statement to the effect that it must be shown that there was an "abuse of discretion." Recently it has been shown time after time that the term "abuse of discretion" does not mean any reflection upon the presiding Judge, and it is a strict legal term, to indicate that the appellate Court is simply of the opinion that there was commission of an error of law in the circumstances.

Where actions may be properly consolidated without injury to any of the parties, that course should be taken to prevent a multiplicity of suits, to save costs to the parties themselves, to conserve the time of the Court, to clear congested dockets, and to help the taxpayers, who bear the expenses of maintaining Courts.

A defendant, when brought into Court in separate actions on numerous complaints which could be joined in one suit, has a substantial right to request the Court to force his adversary to try all the cases together, when such trial can properly be had, for no man, even if he is a defendant in a Court, should be harassed and annoyed with continued useless litigation. In our opinion, all four

of the suits brought by the plaintiff should have been consolidated, and the exception raising that question is sustained.

The most vital question in the appeal relates to the refusal to direct a verdict for the defendant. Proper consideration of the exceptions as to that refusal demands an examination into the facts of the cause. Plaintiff, a property owner within, or close to, the limits of the City of Columbia, desiring electric power for two houses owned by him, on January 20, 1925; entered into a "construction contract" with the Columbia Railway Gas & Electric Company, predecessor of defendant, and deposited thereunder the sum of $66.08. On the same day, presumably, plaintiff and the company last named also entered into what is called a "service contract," which it seems became effective, so far as payment to be made thereunder, on January 23, 1925. (These two instruments and rules Nos. 5, 8, 15, and 18, set out in the transcript of record, will be reported.)

It is not so shown, affirmatively, but we think we are right in stating that plaintiff paid promptly all of his service bills up to and including the one due for the month ending July 22, 1925. These bills for the two houses amounted to $9.36, of which $3.61 was chargeable to the plaintiff's own residence, and the balance to the house of his tenants, which we assume plaintiff was also to pay. It was conceded by the parties that plaintiff was entitled on the refund account under the construction contract on July 1, 1925, to 25 per cent. of $9.36, equaling $2.34. If entitled to interest, as claimed by plaintiff, the defendant admitted that such item amounted to an additional sum of $1.76. In July, 1925 (the exact date does not appear), defendant mailed plaintiff a statement and voucher for $2.48, said to be on the "refund account" as per the construction contract. On August 18th plaintiff had his attorney write defendant a letter, acknowledging receipt of the voucher and statement, but notifying the defendant that there was "evidently a mistake in regard

to the refund of 25 per cent. of amount paid for consumption from January 20 to July 1, 1925." A larger sum—not stated, however—"as refund" was claimed, and defendant was informed that, if the matter was not properly adjusted, plaintiff desired return of his deposit of $66.08. On August 24th defendant wrote plaintiff, stating that it had noted that the voucher for refund had not been cashed, that there was an error therein, and requested return of that voucher, and promised that a correct voucher would be issued. On August 27th plaintiff's attorney again wrote defendant, requesting a new bill showing amount claimed by defendant to be due plaintiff on the construction contract. This letter, it appears, was not answered. Demands were made on plaintiff repeatedly for the payment of his service bills for the months of August, September, October, and November. On December 19th defendant notified plaintiff by letter that, if his arrears for light service for the four months named, amounting to $3.20, were not paid by noon, December 22, 1925, his service would be discontinued, and again request for payment of the bills was made. The bills not having been settled, on December 22d, presumably in the afternoon, over plaintiff's objection, the service was disconnected. On December 28th plaintiff requested defendant to send him statement of the interest due on his deposit to December 22, 1925, and also the amount due him as 25 per cent. "discount" on all sums collected from persons on his line to the last-mentioned date. January 4, 1926, defendant, replying to plaintiff's last letter, informed him that his line was being investigated for the purpose of determining whether or not any other line had been "tapped in" thereon. Plaintiff, again, on January 5, 1926, requested statements from the defendant as to the interest due on his deposit, and as to the amount due him for refund for power furnished over his line. February 20, 1926, plaintiff made written demand that his service be restored not later than noon, February 23d. The record does not disclose any re-

sponse by defendant to plaintiff's last communication. Soon thereafter the suits were instituted.

The plaintiff's testimony contained the following, the italics being supplied by us:

*"There is no dispute between me and the company about the total amount of the bills for electric light service for the two houses. The only dispute is about the interest. If there is an error any other way, I do not know it.* The records show that at the house I am living in $3.61 of current was used from January to July 1st. Different people, Mr. Hightower, Mr. Arnold, and Mr. Hartley, lived in the other house. I cannot tell whether $5.75 for current used at the other house from January to July is correct or not. But, if correct, that amount, plus the $3.61 used at my house, would make something like $9.36, and I would be entitled to a refund of 25 per cent. on that amount, or $2.34. The defendant sent voucher for $2.48, but afterwards said it was an error, and I wrote them to send me another voucher. * * *

*" * * * I do not deny not paying my electric bills for four months. Beginning with August, including December, it will be five months. Under my contract I was to pay the bills monthly.* I lived up to the contract until defendant did not live up to its. I received notices of cutoff a good while before they cut me off. I did not claim in the first letter to defendant that I was entitled to interest, because it was in the voucher. I had no right to complain about interest when they had sent it. My claim was that the refund was wrong and the interest wrong in a way. It was only five months, when six months had elapsed. When defendant wrote that the voucher was in error, I did not try to find out the error, except through this correspondence."

The main witness for the defendant testified:

"I knew by August that there was a dispute with Mr. Barrett as to the amount due him by the company on account of his construction contract. *But there was no dis-*

*pute about his bills for electric service.    Bills for that were correct.*    If no voucher had been sent Mr. Barrett, and if he is entitled to the interest which he claims, and if the contract for electric service and the contract for the construction of the line are not to be separated, then the company owed Mr. Barrett at the time he was cut off the sum of 10 cents; but, if a voucher for $2.48 had been sent him, then he was indebted to the company at the time of the cut-off as I have testified.

"He was cut off within nine days of another credit due him on account of the refund and interest for the six months beginning July 1st.    The interest and refund due him on January 1, 1926, on account of his construction contract amount to $4.67.    In nine days after he was cut off he would have been entitled to an additional credit of $4.67.

"I have no knowledge of the voucher for $2.48; never saw it before.    Have known Mr. Barrett for a number of years, but had no conversation with him at the time he applied to have the line constructed."    (Italics added.)

Included in the grounds upon which defendant asked the direction of a verdict in its favor was this:

"That the right to discontinue service in this case is determined by a service contract and cannot be affected by any debt due Mr. Barrett under the other contract under which the line was constructed, and in holding that he (the Court) could not separate the contracts."

Both parties seem to concede in their arguments that the decision as to the correctness of the ruling of the presiding Judge on the motion for a directed verdict, on the ground stated, depends almost entirely upon what this Court conceives to be the holdings made in the cases of *Poole v. Paris Mountain Water Co.,* 81 S. C., 438; 62 S. E., 874; 128 Am. St. Rep., 923, and *Johnson v. Carolina Gas & Electric Co.,* 106 S. C., 447; 91 S. E., 734.    The respondent contends that the case at bar comes exactly within the principles an-

nounced in those cases, while the appellant urges that the decisions referred to are not controlling of the question here.

In the *Johnson case,* this Court held that a public service corporation could not discontinue a consumer's water supply at two places, even if the consumer had declined to pay a debt previously due for water furnished one of the same places by another company, which debt had been assigned to the corporation which discontinued the service by the company to which the debt was due. That decision was rested, mainly, upon the *Poole case, supra,* and *Benson v. Paris Mountain Water Co.,* 88 S. C., 351; 70 S. E., 897.

The *Benson case,* while somewhat similar to that of Johnson, has some distinguishing features therefrom. There, the water company refused to supply the consumer with water at his residence and at a stable conducted by him, because of failure of the consumer to adjust a claim for water previously furnished by the same water company at an entirely different place. However, very much on the authority of the *Poole case,* this Court decided that the water company should supply the consumer with water at the desired places, since the consumer offered to comply with the requirements to secure water there, and tendered the amount due for arrears of water rent at his residence and stables.

The principle announced in the *Poole case, supra,* was this:

"While a public service water company has the right to cut off a consumer's water supply for nonpayment of recent and just bills for water rents, and may refuse to engage to furnish further supply until said bills are paid, the right cannot be exercised so as to coerce the consumer into paying a' bill which is unjust, or which the consumer in good faith and with show of reason disputes, by denying him such a prime necessity of life as water, when he offers to comply with the reasonable rules of the company as to such supply for the current term."

While water is a greater necessity of life than electricity, in modern conditions, the latter is yet regarded as of prime importance, and it is supplied by public service companies just as water is furnished by these companies. It is manifest that the principles applicable to water companies and their patrons apply with equal force to public service companies engaged in the sale and distribution of electric power to the public.

Under the *Poole case,* and the other cases resting on that decision, the defendant here had the right to discontinue its service to the plaintiff upon the nonpayment by the plaintiff of recent and just bills for the service furnished him, and had, also, the right to refuse a further supply of electricity until those bills were paid.

The position of the plaintiff, however, is this: He admits the justness and correctness of the bills for the service furnished, but he contends that the defendant was due him on his construction contract an amount equal, or greater, than the sum he was due to the defendant for the service; that the amount due him should have been credited by the defendant to plaintiff's account for service, and when such credit was given, the service account would have been extinguished, or the situation, at least, was such, under the circumstances, to show that there was a *bona fide* dispute as to the amounts due by the plaintiff to the defendant for his service, and therefore the defendant had no legal right to disconnect the service. He asserts also that the check for $2.48, which was sent him by the defendant on the construction account, even if sufficient to cover the sum then due him, was not payment, since he did not accept it as payment. The plaintiff also says that the two contracts between him and the predecessor of the defendant, which were assumed by the defendant, are inseparable, and should be considered and construed together. Because of these contentions of the plaintiff, this case has features which differentiate it altogether from either the *Poole, Benson,* or *Johnson cases.*

With reference to the two contracts, we think they should be treated as separate and distinct instruments, and it must have been the intention of the parties that they be so regarded. The fact that two papers were drawn and executed is the first important indication that the intention was to have two separate contracts as to the two matters contracted about, and to keep the two accounts between the parties separate and distinct. If the intention had been otherwise, it is more than likely that the agreements contained in the two instruments would have been embodied in one paper, for this easily could have been done. It is not difficult to understand why the company, the predecessor of the defendant, desired two papers. It is well known that large power concerns have, and must keep, in their employ many employees, and have numerous departments. It was necessary for the construction department to have before it, when needed, the contract relating to the construction of the line. It was necessary for the accounting department to have before it the contract as to the service to be furnished thereunder. The rules of the Railroad Commission, to which both these instruments referred, had to be carried out by the company, and different rules of that commission applied to the two contracts. There is no particular reference in either of the instruments to the other, and, certainly, nothing to show that the conditions of one or the performance of such conditions entirely depended upon the other. It is especially true that the performance of the service contract on the part of the consumer was not necessary to protect his rights under the construction contract. The latter is limited, so far as the consumer's rights are concerned, to a period not exceeding five years from its date. At the expiration of those five years, that contract becomes terminated. The life of the service contract is indefinite and uncertain after January 23, 1926, for after that date either party had the right to terminate it by the simple act of giving 30 days' written notice to the other of intention so

to do on a designated date.    The refund payments to be
made to the consumer, under the construction contract, de-
pended upon the amount of current distributed over the line,
not to the consumer alone, but to any and all persons who
might be served by that line.    The payments to the con-
sumer, under that contract, are to be made by the company
every six months, and are to cover the amounts due for the
preceding six months.    The bills of the consumer to the
company, by the service contract, are to be paid monthly.
The plaintiff is entitled to interest on his deposit, to be re-
paid in the same manner as the deposit.    A reading of Rule
No. 15 of the Railroad Commission shows that the consumer
is to be paid interest at 6 per cent. per annum on the amount
deposited by him with the company.    The payment of that
interest, however, like the repayment of the amount de-
posited, is to be made in proportion to the amount of power
furnished over the constructed line.    The refunds to be
made on the deposit, with interest added, are 25 per cent. of
the bills for service furnished by the company over the line.
These payments are to continue as long as five years, but no
longer, until the whole of the amount of the deposit, plus
interest, has been paid.    The payments due to the consumer
on January 1st and July 1st of each year are simply 25 per
cent. of the bills for service over the line for the preced-
ing six months.    They are not to be for 25 per cent. of the
deposit or interest, or any percentage of the deposit and in-
terest.

According to our calculations, at the time the cut-off oc-
curred, December 22, 1925, the condition of the accounts
between the parties, so far as payments to be made there-
under, was this:    The plaintiff owed the defendant on that
day $4, but only $3.20 thereof was really past due; the com-
pany owed the plaintiff on the construction account 25 per
cent. refund on his bills for service up to July 1, 1925, of
$9.36, which amounted to $2.34.    The 25 per cent. of the
bills from July 1st was not due until January 1, 1926.    If

the plaintiff had the right to credit on his service bills, $3.20, the refund of $2.34, he still owed the defendant on December 22, 1925, a balance of 86 cents.    In our calculations we have not considered the voucher for $2.48 sent to the plaintiff by the company.    It appears, therefore, that at the time of the discontinuance of the service, the plaintiff was due to the defendant a recent and just bill for current rents, which the plaintiff declined to pay.

The respondent insists, however, that, in any event, the situation was such as to show that there was a *bona fide* dispute as to the amount due by the plaintiff to the defendant for his service, and, in that circumstance, the defendant committed a tort by discontinuing the service, and in failing to restore it on demand.    That seems to be the pivotal point in the whole case; and, as to that, the right of set-off on the part of the plaintiff of his claim, under the construction contract, against the account of the defendant against him for the current rents, is involved.

It is to be conceded, if the defendant in another action, as plaintiff, had sued the plaintiff, as defendant there, for the amounts of the service bills, that the plaintiff had the right to offer as a defense in such action his claim against the company under the construction contract; but an entirely different situation is presented.    The defendant did not sue for its service.    In fairness to the plaintiff, we consider the case on his contention that the company should have deducted from the service bills the amount due him under the construction contract, and any and all interest which might thereafter be due to him.    In other words, we pass upon the claim that, before the cut-off was made, the defendant should have credited on the service bills the amount it was due to the plaintiff under the construction contract, and, for the benefit of the plaintiff, regard the case as showing that such credits would have equalled, or exceeded, the amount he was due on his service bills.

To sustain, however, the contention of the plaintiff, this Court will have to go farther than it went in the *Poole case,* or in any one of the cases based on the decision therein.   It will have to say, when there is no dispute whatever as to the bills of a public service company for water or electricity supplied to its customer, and the customer at the time has any kind of demand against the company which he may use as a set-off against his debt to the company, that the latter cannot enforce payment of its service bills by the well-recognized usual right to discontinue its service, until there has been an adjudication by a competent Court of all the respective claims and contentions of the parties.   In the absence of any legislative direction on this subject, this Court has to state what it conceives to be right and just in the premises.   In doing so, it must not only have due regard for the rights of the parties to this litigation, but must look forward to situations similar, or akin, to that in the case at bar, which may arise in the future.

The denial of the usual power of a public service company to cut off its patron's supply of water or electricity, when there is a *bona fide* dispute as to the amount due for the service furnished, is founded upon the principle that the patron is not to be penalized, oppressed, or coerced because he asserts his rights as a citizen to dispute, in good faith, a bill of the company.   It is not based upon the other idea that the consumer has the right to require a continuance of the service when accounts therefor are not questioned, until there is a settlement of some other account or demand that the consumer may have, or claim to have, against the company, other than one with reference to the service bills.   If the latter principle were the foundation of the rule in respect to the mutual rights of the parties as to a continuation of the supply of water and electricity, impecunious and advantage-seeking individuals could, by the assertion of almost any kind of demand against a public service company, require it to continue almost indefinitely to supply them with

either water or electric current.   Water and electric com-
panies, in their activities, have numerous persons to deal
with, and transactions of multiple and varied characters.
To pursue the course suggested in a way by the position of
the plaintiff as one to be adopted in dealings between a
public service water or electric company and its patrons
would require the company, before it could discontinue the
service of a patron delinquent in the payment of his bills·
for such service, to see that the company was not, through
some other department than that in charge of rendering bills
for service, possibly indebted to all its patrons.   Such com-
pany with bonds outstanding would have to be assured, be-
fore cutting off a consumer's supply, that such consumer
was not a holder of one of its bonds, or, if he were a holder
thereof, that he had been sent a voucher for interest due on
the bond he held, and that he had accepted and cashed the
voucher for such interest.   If the patron of the company
were a hardware merchant, the company would have to be
certain that its construction department had paid all bills
incurred with him for pipes or other equipment furnished to
the company.   Many other like illustrations could be given.

Again, water and electric companies may be engaged in
their operations in two or in several places.   The theory of
the plaintiff might make it necessary for a company so sit-
uated to continue its service to a nonpaying customer in the
village of A, where he had his summer home, for fear that
there was an obligation due him in the city of B, where he
had his store.

It must not be overlooked either that many of our munici-
palities, under legislative sanction, for the health and com-
fort of their citizens, are engaged in the business of supply-
ing water and electricity.   To establish the necessary plants,
in numerous instances, the people of these municipalities
have voted bonds to procure the required money therefor,
and have assumed the payment of the principal and interest
thereon.   Municipal plants, in most respects, are subject to

the same general legal principles in their dealings with their patrons as are applicable to privately owned concerns. If plaintiff's contention is sound, the commissioners of public works of "N" could not discontinue the water supply of Mr. X, a dealer in live stock, who is indebted for water furnished, and the bill known to be correct, until the commissioners ascertain if the city treasurer's check to Mr. X, for a mule sold by him to the garbage department of the city, had been accepted and cashed. The commissioners of public works would also have to be certain that a street laborer had been paid all the money due this laborer through the street department, before the laborer's electric lights could be turned off for nonpayment of an admitted correct bill for the burning of these lights.

We cannot agree that the position of the plaintiff is correct, nor that the doctrine of the *Poole* case was ever intended to be extended farther than is plainly announced therein. The principle there declared was founded upon the sound and just idea of protecting the consumer's right to a prime necessity of life against the great power which might be exercised, unwarrantedly, by a public service company. It prevented the public service company from being judge and jury as to the claims of the consumer against itself, growing out of their agreements and transactions as to the furnishing of that prime necessity of life. It could not have been the intention of the principle of the *Poole* case to prevent, in any instances, the right of a public service company to collect money honestly (due?) from a delinquent patron. It surely was not intended to make the patron a judge and jury to pass upon the justness of some claim he might hold against the company, extrinsic to the particular contract as to the supply of water or electricity. The defendant's motion for a directed verdict in its favor should have been granted. The exceptions as to the refusal to grant that motion are sustained.

In view of the conclusions we have reached, we deem it unnecessary to pass upon the other exceptions.

The judgment of this Court is that the judgment below be reversed, and that a verdict in favor of the defendant be entered up, as provided under Rule 27 of this Court.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES COTHRAN and STABLER concur.

MR. JUSTICE CARTER (dissenting): Being unable to agree to the conclusion reached in the leading opinion in this case written by Mr. Justice Blease, I most respectfully dissent for the reasons I shall briefly state. The transcript of record contains the following brief statement and synopsis of the issues which are quotted herewith 'for the purpose of convenient reference:

### "STATEMENT

"This controversy arose on account of the discontinuance by defendant of plaintiff's electric light service, and resulted in four suits, the complaints in which are hereinafter set forth.

"The several complaints were served on or about March 10, 1926, and came on for trial before his Honor, J. K. Henry, and a jury on March 24, 1926, and resulted in a verdict for plaintiff for $455 actual damages and $1,000 punitive damages.

"Upon a motion duly noticed defendant moved that all of the cases be consolidated and tried together, upon the ground that they all arose out of the same transaction and that defendant was entitled in order to avoid a multiplicity of suits to a trial of all the actions together. This motion for consolidation was granted as to three of the cases, but refused as to the fourth case, and such refusal forms the basis of one of the exceptions. Motions for nonsuit, direction of a verdict, and for a new trial were duly made, all of which were overruled, and within due time defendant served notice of intention to appeal.

"Issues

"The three complaints which were consolidated, omitting formal parts, are as follows:

"First:

"(1) That the defendant is a corporation created and existing under the laws of South Carolina and was at the time hereinafter mentioned, and is now, a resident and citizen of South Carolina, and on said date the plaintiff was and is now a resident and citizen of South Carolina.

"(2) That on January 20, 1925, the plaintiff became a subscriber to the electric service of the defendant and continued as a subscriber until December 22, 1925. The defendant and its agents negligently, carelessly, recklessly, willfully, unlawfully, and in a high-handed and outrageous manner entered the premises of the plaintiff and discontinued his said electric service, thereby greatly inconveniencing, annoying, embarrassing, and humiliating the plaintiff, to his damage $3,000.

"Second:

"(1) That at the time hereinafter mentioned the defendant was a corporation created and organized under the laws of South Carolina and was, and is now, a resident and citizen of South Carolina.

"(2) That on or about December 22, 1925, the defendant and its agents, after having been by the plaintiff first forbidden to do so, entered on the premises of the plaintiff and willfully, maliciously, and unlawfully trespassed thereon and disconnected and discontinued the electric service of the plaintiff, the plaintiff having forbidden the said defendant and its agents to disconnect and discontinue his said electric service.

"(3) That the acts and conduct of the defendant and its agents as aforesaid were negligent, reckless, willful, unlawful, and outrageous, and said unlawful acts and conduct of the defendant as aforesaid greatly inconvenienced,

annoyed, embarrassed, and humiliated the plaintiff, to his damage $3,000.

"Third:

"(1) That at the time hereinafter mentioned the defendant was a corporation chartered and organized under the laws of South Carolina, and was and is now a resident and citizen of South Carolina.

"(2) That at the time mentioned the plaintiff was, and is now, a resident and citizen of South Carolina.

"(3) That on December 22, 1925, the defendant negligently, carelessly, recklessly, willfully, and unlawfully discontinued the electric service of the plaintiff.

"(4) That the plaintiff has made demand upon the defendant and its agents to restore his electric service which was unlawfully discontinued as aforesaid, but the said defendant has negligently, recklessly, wantonly, and willfully refused to connect and restore the said electric service of the plaintiff as aforesaid, thereby causing the plaintiff great inconvenience, annoyance, and humiliation, to his damage $10,000.

"The complaint which was not consolidated is as follows:

"(1) That at the time hereinafter mentioned the defendant was a corporation chartered and organized under the laws of South Carolina and was a citizen of that state engaged in the business of manufacturing and selling gas and electricity to the people of Columbia and other towns and citizens of South Carolina, and upon information alleges the defendant is worth $20,000,000.

"(2) That at the time hereinafter mentioned the plaintiff was a resident and citizen of South Carolina.

"(3) That on December 22, 1925, the defendant and its agents negligently, unlawfully, recklessly, wantonly, and willfully entered the premises of the plaintiff and discontinued his electric service.

· "(4) That since the discontinuance of the said electric service of the plaintiff as aforesaid he ·has made repeated demands of the defendants and its agents to restore his said electric service, but the said defendant and its agents have negligently, wantonly, carelessly, recklessly, and willfully refused to restore the electric service of the plaintiff aforesaid, thereby causing the plaintiff great inconvenience, annoyance, embarrassment, and humiliation, to the damage of the plaintiff $10,000.

## "ANSWER

"The answer of the defendant in each of the cases set up a general denial and alleged that the furnishing and discontinuance of plaintiff's electric service were in accord with the rules and regulations of the defendant, and rules and regulations promulgated or approved by the Railroad Commission of South Carolina, and also in accordance with contracts between plaintiff and defendant, and, further, that defendant's entry upon plaintiff's premises was in pursuance of a right granted defendant in writing on January 19, 1925, and duly recorded in the clerk's office for Richland County, and in each of the cases the answer further set up that another action was pending between plaintiff and defendant upon the same cause of action."

The question presented at the threshold of the consideration of the appeal is the question raised by the exception imputing error to his Honor, J. K. Henry, presiding Judge, in refusing the motion of the defendant to consolidate and try together all four of the cases in question. As shown in the statement quoted, his Honor, Judge Henry, ordered a consolidation of the first, second, and third cases, but refused the motion as to what was termed the fourth case. Appellant based its motion to consolidate all of the cases "upon the ground that they all arose out of the same transaction and that defendant was entitled in order to avoid a multiplicity of suits to a trial of all of the actions together." In

refusing the motion as to the fourth suit, his Honor did not state the grounds upon which the refusal was based, so far as the record discloses, and we must therefore look to the allegations contained in the several complaints and to what transpired before the Court for an answer. All of the actions set forth under the several suits, being connected with the same transaction, under Section 430, Vol. 1, Code of 1922, could have been united in the same complaint. While this may be done under this section of the Code, it is not mandatory, and neither was it mandatory on the Circuit Judge to grant such motion for consolidation. As pointed out in the leading opinion, the complaints of the first and second case contain no allegation as to the plaintiff's demand on the defendant to restore the electric light service nor as to defendant's failure and refusal to comply with such request and demand, whereas the third and fourth suits contain such allegations. Thus it is clear that under the third and fourth suits the plaintiff sought damages for defendant's failure and refusal to restore electric service, whereas, in the first and second suits, he did not seek such damages. This distinction furnished the Circuit Judge some ground for refusing defendant's motion for consolidation as to the fourth suit, taking the view, evidently, that the plaintiff should be permitted to try this special issue raised in the fourth suit separately, bearing in mind that, should the other issues raised in the fourth suit be adjudicated in the trial of the other suits, the Court could issue the proper order at the proper time for the protection of the parties.

As to the consolidation of the third case with the first and second cases, I think this should not have been done, and I am of the opinion that it occurred through oversight, his Honor very likely having overlooked the fact that the third suit also contained an allegation as to the refusal of the defendant to restore the service as contained in the fourth suit, but the defendant had no right to complain concerning the Judge's action as to this. The plaintiff was the only one to

complain, and, instead of appealing from the Judge's order consolidating the third suit with the first and second suits, the plaintiff, by his counsel, announced in open Court that in the consolidated suit (suits 1, 2, and 3) he would not ask for damages for failure to restore service and the defendant made no objection to this.    Therefore the complaints in the consolidated suit (consolidation of suits 1, 2, and 3) must be considered as containing no allegation as to the defendant's failure to restore service and that that issue was left to be tried on the trial of the fourth suit.    I think, under the circumstances, that his Honor, Judge Henry, made a proper disposition of the motion to consolidate as to the fourth suit and that his ruling should not be disturbed.

In this connection, I might add that the authorities cited in the leading opinion on this question are not, according to my view, in conflict with the conclusion I have reached, but are in support of the same.    The section of the Code to which reference is made in the leading opinion, as is pertinent, is as follows:

*"What Causes of Action May be Joined*—The plaintiff may unite, in the same complaint, several causes of action, whether they be such as have been heretofore denominated legal or equitable, or both, where they all arise out of:    1. The same transaction, or transactions connected with the same subject of action; or.    *   *   *   "

Granting that the case comes squarely under this section of the Code and that the plaintiff could have alleged all causes of action that he had in one complaint, and further granting that such provision of the Code was intended for the benefit of the defendant as well as for the plaintiff (though it is not so stipulated), I call attention to the fact that this section of the Code referred to is not mandatory, and when questions arise that come within the purview of the provisions of this section of the Code, the question must, of necessity, be left largely to the wise discretion of the trial Judge, just as many other matters that arise before him dur-

ing the trial must, of necessity, be trusted to his wise discretion, and, unless there is a manifest abuse of the trial Judge's discretion, his ruling should not be disturbed, even though the members of this Court should think that they would have made a different ruling if they had been on the Court below.

As to the case of *Cline v. Railway,* 110 S. C., 534; 96 S. E., 532, to which attention is called, that case simply holds, in effect, that causes of action of the nature in question may, under the provisions of the section of the Code referred to, be united and tried together, but it does not follow that they must be so united and tried together. The same may be said of the other authorities cited. According to my view, the trial Judge is the proper tribunal to decide such questions, and, in the case at bar, the trial Judge having exercised his wise discretion and decided that the suit referred to as the fourth suit ought not to be consolidated and tried together with the first, second, and third suits, this Court should not interfere. Of necessity, there are some matters that must be left to the discretion of a trial Judge and this is one. It is true the discretion of a trial Judge in some instances, such as mandamus, must be guided by law and cannot be exercised on a denial of a plain legal duty, but, as stated above, there is nothing in the section of the Code referred to requiring the Court to consolidate suits. The provision is that the plaintiff *may* unite such actions in one complaint, and because the trial Judge refused the defendant's motion to consolidate all of the suits in question furnishes no ground for this Court to interfere, according to my view. The trial Judge has not only exercised a wise discretion in refusing the motion, but passed upon the merits of the motion and in the interest of justice refused the same.

Further, as I view the case, to sustain this exception would deprive the plaintiff of a trial, on the issues raised in the fourth action—the question of damages for alleged re-

fusal of the defendant to restore the electric service after notice and request to do so. While during the course of the trial there was testimony brought out bearing on these allegations, as stated by counsel for the plaintiff, it was only pertinent on the question of malice, and counsel in a clear statement to the Court stated that this issue—the issue set up in the fourth action which charged the defendant with failure and refusal to restore the service after notice and request to do so—was not to be submitted to the jury, and the Court so instructed the jury. To this procedure the defendant raised no objection whatsoever. The plaintiff is entitled to a day in Court on this issue and, for this additional reason, I think this exception should be overruled, regardless of what disposition may be made of the other exceptions. As to the exceptions imputing error to his Honor, the presiding Judge, in refusing the defendant's motion for a nonsuit and motion for direction of a verdict, I think the same should be overruled.

In considering the questions presented under these exceptions it will be necessary to refer to the facts involved in the case, but I do not think it necessary to refer to the testimony in detail. For a fuller statement of the testimony reference may be had to the opinion of Mr. Justice Blease. The plaintiff contends that the defendant wrongfully disconnected and discontinued the electric light service on his premises. Defendant admits having discontinued the service as alleged by the plaintiff, but contends that in doing so it was acting within its contractual rights; that, at the time the service was discontinued, the plaintiff was indebted to the defendant for such service. On the other hand, the plaintiff contends that he was not indebted to the defendant, but that defendant was indebted to him at the time the service was discontinued. Further, the plaintiff contends that there was a *bona fide* dispute as to the amount between the parties and that for this reason alone the defendant had no right to discontinue the service. The defendant denies that there

was any dispute concerning the amount owing for charges
for electric service.

It appears from the facts disclosed by the transcript of the
record that the plaintiff, who resides in the country not far
from the City of Columbia, desiring electric service for his
premises, made application in writing to the defendant for
such service.   The defendant, it appears, was willing to fur-
nish to the plaintiff the service desired, but had no line lead-
ing to plaintiff's premises, whereupon the defendant offered
to furnish the service, if the plaintiff would advance to the
defendant a sufficient amount of money for the construction
of the necessary service line and connecting the same, and
the parties thereupon signed an instrument of writing to that
effect, the instrument signed being referred to as the con-
struction contract.   Just when the application for service
was made by the plaintiff and when the construction con-
tract was signed by the parties the record does not disclose,
but it is reasonable to presume that the construction contract
was entered into pursuant to plaintiff having made applica-
tion to the defendant for electric light service.   I call at-
tention to the fact that the application for service which
plaintiff made to the defendant was not signed by the de-
fendant.   It was simply a written application on the part of
the plaintiff to the defendant for the electric light service
desired and the construction contract must have been entered
into between the parties pursuant to such application having
been made, and was therefore executed after the plaintiff
made his application for service.

I call attention to this for the purpose of showing that the
two papers were not separate, distinct, and independent con-
tracts, as contended, but from the outset were interdepend-
ent.   The construction contract which was executed by the
plaintiff and defendant was based on the application of the
plaintiff, which latter paper was signed by the plaintiff only.
Both papers pertain to the same transaction.   The plaintiff
desired electric light service for his premises and this fact

was made known by plaintiff's application for such service. The defendant desired to furnish the service, but had no line to the place in question.    Thereupon defendant offered to furnish this service, if plaintiff would furnish the money for the cost of "furnishing, construction, and placing in operation of an electric service line extension, *including the cost of service connections.    * * *"* (italics added), and a contract was accordingly executed by the parties, containing the above-quoted language.    The estimated cost of this work and the material to be used in connection with the same was $66.08, which amount of money the appellant advanced to the defendant before the work was commenced, to be refunded to the plaintiff under the terms of said contract, and the rules of the Railroad Commission, to which reference is made in the said contract, to which terms I shall further on in this discussion call attention.

I do not agree with the contention that the two papers, the application for service and the contract, should be treated as independent matters.    Both papers were intended for the same purpose, namely, to procure electric light service, and the said sum of money ($66.08) was advanced to the defendant by the plaintiff for that purpose and no other.    The description of the premises, for which electric light service was desired, mentioned in one paper, is the same as contained in the other paper.    Further, under Rule 15, to which reference is made in the contract, the defendant was to give the plaintiff credit each six months, "in an amount of 25 per cent. of the consumer's bills for service furnished, until the sum of all credits is equal to the original deposit made ($66.08) to the company, plus 6 per cent. interest per annum."    Rule 15 further provides:

"Should additional business be secured on the main and distributing lines, built under such deposit, an additional credit will be made of 25 per cent. of the additional business service from the main or distributing line extension.    Settle-

ment to be made to the depositor semi-annually, January 1st
and July 1st."

It is thus seen that the two papers are not independent of
each other, but that it is necessary for the papers to be con-
sidered together.    Settlement could not be made with plain-
tiff under the contract under which he made the deposit,
without taking into account the charges made for furnishing
electric light service, it matters not whether the papers in
question be construed to entitle the plaintiff to receive direct
from the defendant payments at certain intervals, or to re-
ceive same by way of credit on his bill for service, and this
is true, it matters not how many different departments and
officers the defendant may maintain to handle its business.
My position, therefore, is that the two papers must be con-
sidered together, and that, in arriving at the amount owing
to the plaintiff for electric light service furnished, there must
be taken into account the amount plaintiff was entitled to
receive from the defendant under the contract the parties ex-
ecuted.    Considering the case from this viewpoint, what is
the situation?    The leading opinion calls attention to a con-
siderable portion of the testimony, and I shall therefore only
refer to such additional parts as I think are especially per-
tinent to be considered in connection with that pointed out in
the leading opinion.

According to the testimony of the plaintiff, he received
from the defendant in July, 1925, by way of refund and
interest, voucher for the sum of $2.48, but which he did not
cash and did not accept for the reason he did not think it the
correct amount owing to him.    The plaintiff thought he was
entitled to a larger sum.    This, also, is shown from the
letters plaintiff wrote or had written to the defendant.    It
appears that the plaintiff received one statement from de-
fendant, in connection with the voucher, but which the plain-
tiff contended was not correct.    This is shown in letter dated
August 18, 1925.    Plaintiff, it appears, continued to try to
get from the defendant a full statement showing the ac-

counts, and he says that between August 27 and December 22, 1925, he did not receive a corrected statement, although he continued to try to get it.    In his testimony he says:

"My service was discontinued on December 22, 1925.    I cannot see that I owed the Broad River Power Company anything at that time.    With reference to the letter of March 1, 1926, I have not received any notice of my account being credited with interest.    They claim they did not owe me any interest, but the voucher for $2.48 shows that it includes interest.    I did not accept that voucher because it was not enough refund in interest.    It was five months when it ought to have been six, and the refund of 72 cents should have been 72 cents a month.    From the time I received the voucher for $2.48 there has been a dispute between me and the company as to what was due me by the company, and there is still a dispute.    That is what the lawsuit is about. I tried for several months to settle this thing before bringing suit.    I think the company, if it had carried out its contract, would have been in my debt and that they are now."

There was, also, testimony tending to show that defendant failed to comply with plaintiff's request for information for amount of money he was entitled to receive on account of the provision in the contract for 25 per cent. of additional business served from the main or distributing line extension. I also call special attention to the following testimony of A. R. Heyward, witness for defendant:

"The only letter I wrote Mr. Barrett was the one dated December 19th.    I knew that there was a dispute with Mr. Barrett as to the amount due him by the company on account of his construction contract.    But there was no dispute about his bills for electric service.    Bills for that were correct.    If no voucher had been sent Mr. Barrett, and if he is entitled to the interest which he claims, and if the contract for electric service and the contract for the construction of the line are not to be separated, then the company owed Mr. Barrett at the time he was cut off the sum of 10

cents; but, if a voucher for $2.48 had been sent him, then he was indebted to the company at the time of the cut-off as I have testified. He was cut off within nine days of another credit due him on account of refund and interest for the six months beginning July 1st. The interest and refund due him on January 1, 1926, on account of his construction contract amounted to $4.67. In nine days after he was cut off he would have been entitled to an additional credit of $4.67."

This voucher of $2.48, referred to, was never cashed, and was never accepted by the plaintiff because it was not enough, as he stated. It did not, according to the plaintiff's contention, represent the correct amount owing the plaintiff by the defendant.

This testimony of the plaintiff and the testimony on behalf of the defendant, in connection with that referred to in the leading opinion, and in connection with the correspondence introduced in evidence and the contracts in question, according to my view, makes out an issue for the jury on the question of whether or not the plaintiff was indebted to defendant at the time the electric light service was disconnected and discontinued. Therefore his Honor, the presiding Judge, properly refused to grant defendant's motion for nonsuit and direction of a verdict.

But granting, for the sake of argument, that the proof was not sufficient to send the case to the jury on the issue of the account between the parties, it does not follow that the defendant was entitled to a nonsuit or a direction of a verdict. If, as contended by the plaintiff on the trial of this case, there was a *bona fide* dispute between the parties on this question, then the defendant had no right to disconnect and discontinue the electric light service, and a careful reading of the record convinces me that there was not only ground for a *bona fide* dispute between the parties, as to the account, but that there actually existed a *bona fide* dispute, and that the jury was warranted, under the testimony, in reaching

such conclusion. This being the case, the plaintiff was entitled to recover against the defendant. To support this view, attention is called to the cases cited in the leading opinion: *Poole v. Paris Mountain Water Co.*, 81 S. C., 438; 62 S. E., 874; 128 Am. St. Rep., 923. *Johnson v. Carolina Gas & Electric Co.*, 106 S. C., 447; 91 S. E., 734; and *Benson v. Paris Mountain Water Co.*, 88 S. C., 351; 70 S. E., 897.

I shall not quote from these cases for the reason that this opinion is already much longer than I intended it, but for a clear discussion of the rule involved special attention is called to the opinion in each of these cases and the authorities therein cited.

I do not think that the examples given in the leading opinion are applicable to the case at bar. Take, for instance, the example given where an electric light company has outstanding bonds, and has a contract with a consumer to furnish electric light service. The issuing of bonds is one transaction and is a separate and distinct obligation from that of furnishing electric light service, and there can be absolutely no obligation on the company to inquire of the consumer if he holds any of the outstanding bonds before enforcing a collection of an electric light service bill. Whereas, in the case at bar, all acts of the parties point to one end and one purpose—procuring electric light service. The same reasoning may be applied to the other examples given, for in each of them two contracts are involved, two objects are in view, and two purposes to accomplish. Whereas, in the case at bar, there is but one object in view, but one purpose to attain, and the issue involved should be decided with that end in view.

As I view the case, his Honor, the presiding Judge, properly overruled the motions for a nonsuit and direction of a verdict, and I do not think there is any merit in the other exceptions.

It is my opinion, therefore, that all the exceptions should be overruled, and that the judgment of this Court should be that the judgment of the Circuit Court be affirmed.